UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO.: 0101 1:22CR10061-1

| | |
|---|---|
| UNITED STATES OF AMERICA | **DEFENDANT'S MEMORANDUM IN SUPPORT OF SENTENCING** |
| V. | |
| JULIEN TOULOTTE . | |

    This memorandum is submitted in support of the parties' joint recommendation pursuant to the binding rule 11(c)(1)(C) plea agreement of 104 months imprisonment followed by 60 months of supervised release.

    Nothing contained herein is intended to excuse the conduct of Julien Toulotte. He himself acknowledges his wrongdoing and expresses remorse. Yet even though there is no "excusing," this memorandum attempts solely to give insight into Mr. Toulotte and to put him into context, particularly in terms of what could be characterized as an otherwise good life and his current strides in seeking help, albeit after the fact.

**I.**    **STATEMENT OF THE CASE**

    This case originally began as a Massachusetts state case before the United States exercised superseding jurisdiction.

    On March 12, 2021, Julien Toulotte was arrested on state charges at the home of his parents in Ipswich and arraigned in Newburyport District Court. He was held on $20,000 bail until it was posted on March 25, 2021.

On February 18, 2022, while the state case was still ongoing until that time, he was arrested by federal agents and appeared in United States District Court in Boston. After a detention hearing, Magistrate Judge Dein ruled that he could be released on strict conditions if he remained at the home of his parents under their supervision. However, when Judge Dein was immediately informed that his parents had an extensive travel schedule that would result in their not being home a great deal of the time, she ordered him detained without prejudice permitting him to revisit the issue if the situation changed where he could be supervised at home by a responsible adult family member. Nonetheless, he has remained detained the entire time.

On November 17, 2022, before the Honorable William Young in United States District Court for the District of Massachusetts, Julien Toulotte pleaded guilty to:

- One-count charging him with Distribution of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A) and 18 U.S.C. § 2252A(b)(1).

- One-count charging him with Possession of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B) and 18 U.S.C. § 2252A(b)(2).

The Defendant Julien Toulotte now, at this time, intends to present argument in support of the joint recommendation for sentencing.

II.   **JULIEN TOULOTTE'S HISTORY AND CHARACTERISTICS AND THE CIRCUMSTANCES OF HIS OFFENSE**

At first blush, Julien Toulotte's offense appears inexplicable in light of what, to an outside observer, seems to be a happy childhood and mainstream life of family and school and a variety of interests.

He was adopted at the age of three months to a couple who now have homes in Ipswich and Boston and have one older adopted son who is currently doing well. His

father is currently the owner of a successful graphic design business and his mother is an attorney who solely volunteers doing pro bono work for low income veterans. Mr. Toulotte claims to have always known that he was adopted, never had any issues with it, and has loved his parents as if they were his birth parents.

His family has been described as warm and loving, always sat down to meals together, would go out walking together or boating with their neighbors and go on family vacations. His father was born in France and they would travel there annually to *"He knows he is in PCCF (Plymouth County Correction Center) because of mistakes he has made. But he has come to a place where he is constant and steady about bettering himself, so that he might leave PCCF as a much better person. I totally support him. While being confined, Julien will use what he already knows and continue to follow the path he is on."* visit with family and also traveled extensively to other places.

He has a large extended family here that gets together frequently in what has always been described as fun times and, in fact, every Thanksgiving there would be 27 people gathered around the table.

His parents were committed to giving him a good education and he went to private schools – the Shady Hill School in Cambridge for K-8 and the Belmont Hill School for high school. There was a period in high school when his grades started to go down, his family sought help for him and he was diagnosed with ADHD. With proper medication and counseling, he markedly improved. He was rather well-rounded, did well in sports, had many friends, had a number of interests such as cooking, and hit the usual dating milestones. However, there were periods in his young life where he felt awkward, a bit of a social outcast and suffered from depression.

He was admitted to Union College in New York state by early admission, then after his first year, he took a year off working on a program called WWOOF (Worldwide Organic Farming) at organic farms and vineyards in Europe. He transferred to

3

Quinsigamond College in Worcester where he made the Dean's List and was admitted to the Phi Theta Kappa honor society as he was preparing to segue into Worcester Polytechnic Institute to pursue his engineering education.

At the time of his arrest, he was attending college, was in a relationship with a female graduate student his age and was working as a barista at a coffee shop and bartending. From a young age, he always has had a strong work ethic, though has never ever worked around children such as babysitting or camp counseling.

Against this backdrop of a seemingly good life of work, school, family, relationships, numerous interests and a great deal of support, it makes the behavior that resulted in these criminal charges all the more seemingly inexplicable.

His long-term viewing of illegal pornography and, although not the subject of criminal charges, his engaging in disturbingly sordid fantasy conversations seems, at first glance, to be so disconnected to the life he has led. However, it cannot be denied.

Upon his arrest two years ago until he was detained after one year when his case came under federal jurisdiction, Julien Toulotte became actively engaged in sex specific counseling simultaneously with both New England Forensic Associates in Arlington, a center for the evaluation and treatment of problematic sexual behavior and with Dr. Donald Sherak, a psychiatrist based in Brookline with a focus on sexual offending.

However, he did suffer a great disappointment when he was accepted at the highly regarded Keystone Center, an intensive inpatient treatment program for those struggling with sexual compulsivity and trauma and yet the state court at Newburyport, in its discretion, refused him permission to leave the Commonwealth of Massachusetts to attend. (It is located in Chester, Pennsylvania and, oddly enough, is the closest inpatient

4

facility for sex offender treatment to Massachusetts.) It frustrated his new determination to gain insight into why he has conducted illegal behavior.

Equally frustrating to him is the fact that, while he has been held for a year in the Plymouth County Correctional Center, no treatment program exists there. He has tried to make the best of things while there by reading an extensive number of books on pornography addictions and sexual addictions and intensive ongoing one-on-one counseling with the Jewish chaplain assigned there. Although adopted, his mother is Jewish, he wanted to learn more about the religion, then became very connected to the rabbi there for more personal counseling.

Rabbi Lawrence Silverman writes,

> *"He knows he is in PCCF (Plymouth County Correction Center) because of mistakes he has made. But he has come to a place where he is constant and steady about bettering himself, so that he might leave PCCF as a much better person. I totally support him. While being confined, Julien will use what he already knows and continue to follow the path he is on."* (See Exhibit D attached)

Still, in his efforts to get to the bottom of why he has done what he has done, Ju;lien Toulotte, at least, gained an understanding and realization that his concern about himself is not the chief concern here. It is the victims. In the attached letter to the court, Mr. Toulotte writes:

> *"Remaining silent and accepting this sentence without an apology, without expressing regret, without expressing my inner turmoil, would be disingenuous at best. This case is not about me, it is about the victims, who continue to be revictimized and retraumatized whenever someone falls down the rabbit hole, blind to the consequences of their actions."* (See Exhibit B attached)

The attached comprehensive sexual and psychological evaluation of Julien

5

Toulotte by Leo Keating, the clinical director of New England Forensic Associates, provides some understanding of the apparent dichotomy between his seemingly good mainstream life and attraction to and relationships with age-appropriate adult women and his reprehensible compulsive viewing of child pornography. Keating writes that testing showed, "Mr. Toulotte is a heterosexual man with interest in adult females. Additionally, he shows no interest in underage individuals in either gender. . . Mr. Toulotte had an extremely low score on the Cognitive Distortions Scale, a scale that measures attitudes and beliefs frequently used by men who desire sexual contact with children. The score is interpreted as an indication that Mr. Toulotte does not harbor beliefs or attitudes that would support abuse of children."

Keating states that Toulotte began viewing pornography online as far back as elementary school when it unexpectedly popped up on his computer. He first began viewing legal pornography online, then eventually, through curiosity he began viewing more extreme things until he also viewed illegal child pornography. Keating continues:

> *"It is my opinion that he reverted to these behaviors not because he is sexually predatory or has a desire to sexually abuse children, but rather because he was truly addicted to pornography, and never completely availed himself of treatment.*
>
> *"While Mr. Toulotte has engaged in sexual misconduct that is reprehensible and very disturbing, there is no evidence that he has ever committed a "hands on" sexual offense. In our work with several hundred-Internet offenders, we have seen a group of offenders who engage in extremely bizarre and disturbing behaviors in the context of the Internet. Individuals will discuss violent and horrific sexual atrocities, but not actually engage in these behaviors. When the materials are first discovered, there is understandably a great deal of concern about the content, but upon further review it appears that individuals' actual sexual behaviors are inconsistent with the fantasies that*

6

> they discuss on the Internet. As in Mr. Toulotte's case, these individuals are often highly functioning and productive members of society and have normal romantic and sexual relationships with peers.
>
> "In summary, Mr. Toulotte is quite forthright about his problematic behavior of viewing pornography in general, and child pornography as well. His use of illicit pornography appears to be directly related to his pornography addiction. Unfortunately, until his most recent arrest and incarceration, Mr. Toulotte had few consequences associated with his behavior and, thus, he did not take them seriously. While he had legal entanglements, they had little impact on his life and did not function as detrimental. He was also quite young and engaged in immature adolescent denial about his behavior. Now that he has been incarcerated for many months and is facing a lengthy prison sentence, Mr. Toulotte now fully appreciates the serious nature of his offenses. Tragically, this pattern of behavior is not unique. In the past I have seen a subset of individuals who will not take their behavioral problems seriously until such time as they have suffered very serious negative consequences. This concept of hitting "rock bottom," is seen broadly in the treatment of addictions." (See Exhibit A)

**III.     REQUEST FOR JUDICIAL RECOMMENDATION FOR JULIEN TOULOTTE TO SERVE HIS PERIOD OF INCARCERATION WHERE HE CAN GET SEX SPECIFIC TREATMENT, (E.G. FMC DEVENS)**

In light of Julien Toulotte's exceptional strong desire for treatment particularly at his relatively young age of 24, it is requested that he be given the opportunity to make the best use of his time actively engaged in treatment as opposed to being merely warehoused until release. It again must be noted his great disappointment that, when the within case started in state court before the U.S. Attorney's office took jurisdiction, he was not permitted to enroll in the geographically closest inpatient treatment program for sex offenders, the Keystone Center in Pennsylvania, because the state court, in its discretion, did not allow him to travel out of state.

As Leo Keating of New England Forensic Associates indicated above, it is his opinion that Julien Toulotte is ready for and could benefit from treatment.

As Toulotte himself writes:

> *"I implore the Court to consider these facts when proffering a recommendation to the Bureau of Prisons. I would like to continue on the path I have built for myself and for the time I spend incarcerated to not be a period of stagnation and complacency, but of rehabilitation and recovery. That are specific prisons that offer such programs like RDAP and SOTP, one of which is Fort Devens, a facility where my effort and drive will be served well and one close to home where I will be able to keep up with my family ties. Surrounding myself with like-minded individuals working hard toward a common goal would be helpful for me to change. I believe Fort Devens to be such a place."* (See Exhibit B)

Toulotte's mother, Sharon Toulotte, an attorney who works solely on a pro bono basis, is supportive of his request for treatment. She writes:

> We are heartbroken at the legal difficulties Julien is confronting. . .. We firmly believe that what he needs is treatment and not incarceration.  He tells me he wants to change and is reading numerous specialized books on overcoming addiction and on how to change. . . There is a program specifically directed to Julien's addiction in Chester, PA called Keystone Center. Julien and society would benefit from his attending this program. He and society would also benefit if he can serve his sentence at FMC Devens where he can get the necessary treatment."

8

(See Exhibit C attached)

IV.     THE SENTENCING GUIDELINES

The defense acknowledges that the sentencing guidelines are the starting point in determining any sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). However, the Court is also free to reject those guidelines if it feels that those guidelines are inconsistent with the list of factors the Court must consider in fashioning a sentence that is "sufficient, but not greater than, necessary" under 18 U.S.C. §3553(a). *Kimbrough v. United States, supra,* 552 U.S. at 110-111. Such is the case here.

The calculation mandated by U.S.S.G. §2G2.2 is so completely divorced from the Sentencing Commission's institutional role in determining applicable sentences, and so bereft of any empirical support, that it should be given limited deference in determining Julien Toulotte's sentence.

Perhaps no other guideline has spurned such an unabated onslaught of criticism. The second circuit proclaimed the child pornography guideline to be "an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results. *United States v. Dorvee*, 616 F.3d 174, 188 (2 Cir. 2010).

The *Dorvee* Court provided a detailed history of the amendments to the child pornography guidelines and how Congressional interference abrogated the Sentencing Commissions historical role of using empirical data regarding past sentencing practices when pegging current guideline offense levels. Id. at 184-85. The Court concluded that the amendments effected by the PROTECT Act of 2003 "evince a 'blatant' disregard for the Commission and are 'the most significant effort to marginalize the role of the Sentencing Commission in the federal sentencing process since the

9

Commission was created by Congress'". *Id*. at 185. (internal citations omitted).

The *Dorvee* Court further analyzed how the mechanical application of the child pornography guidelines was "fundamentally incompatible with § 3553(a)." *Id*. at 187. Specifically, the Court addressed the dizzying array of enhancements that apply in virtually every case. The Court noted that the impact of "§2G2.2 sentencing enhancements cobbled together through the process routinely result in Guidelines projections near or exceeding the statutory maximum, even in run-of-the-mill cases." Id. at 186. This serves to create an unjust sentencing guideline range. The Court noted that the Commission's sentencing data shows that out "of all sentences under §2G2.2 in 2009, 94.8% involved an image of a prepubescent minor (qualifying for a two-level increase...), 97.2 % involved a computer (qualifying for a two-level increase...), 73.4% involved an image depicting sadistic or masochistic conduct or other forms of violence (qualifying for a four-level enhancement...), and 63.1% involved 600 or more images (qualifying for a five-level enhancement)." The Court concluded that application of these run-of-the-mill enhancements "that are all but inherent to the crime of conviction" results in a "13 level [increase], resulting in a typical total offense level of 35." Id. As a result, "[a]n ordinary first-time offender is therefore likely to qualify for a sentence…rapidly approaching the statutory maximum." *Id*.

The Guidelines call these enhancements "Specific Offense Characteristics." As the Court in *Dorvee* points out, they are anything but specific in that they apply to virtually all convictions under the guideline. Simply put, the child pornography guideline enhancements bear no correlation to the sentencing goals of 18 U.S.C. § 3553(a). See generally Troy Stabenow, Deconstructing the Myth of Careful Study: A Primer on the

10

Flawed Progression of the Child Pornography Guidelines, July 3, 2008, revised January 1, 2009.

The Dorvee decision is only one case in a series of unrelenting criticism. See e.g., *United States v. Hanson*, 561 F.Supp.2d 1004, 1009 (E.D. Wis. 2008) (noting that from 1994 to 2007 the mean sentence in child pornography increased from 36 months to 110 months because of "arbitrary increases" rather than by any empirical approach by the Sentencing Commission); *United States v. Johnson*, 588 F.Supp.2d 997, 1003 (S.D. Iowa 2008) ("As far as this Court can tell, these modifications [to the child pornography guideline] do not appear to be based on any sort of empirical data, and the Court has been unable to locate any particular rationale for them beyond the general revulsion that is associated with child exploitation-related offenses."); *United States v. Grober*, 595 F.Supp.2d 382, 397 (D.N.J. 2008) (characteristics identified by the Sentencing Commission as enhancements are "irrational because logically and factually, the characteristics are simply not genuine aggravating factors. Rather, they are inherent in just about any downloading offense.").

The criticism does not end there. See *United States v. Rausch*, 570 F.Supp.2d at 1298 (lack of empirical support for resulting guideline range of 97-120 months along with poor health justified imposing sentence of lifetime supervised release with home detention); *United States v. Doktor,* Slip Copy, 2008 WL 5334121 (M.D.Fla. December 19, 2008) ``(non-guideline sentence of 36 months imposed on finding that guidelines-produced range of 57-71 empirically unsupported); *United States v. Johnson*, 588 F.Supp.2d 997, 1003 (S.D.Iowa 2008) (complete lack of empirical study underlying child pornography guidelines produced a sentencing range of 121-151 months, well above a

11

sufficient and reasonable sentence of 84 months); *United States v. Stern*, 2008 U.S. Dist. LEXIS 102071 (N.D. Ohio, Dec. 17, 2008)("illogic" of the child pornography possession guideline rendered it worthy of only limited deference and sentence of twelve months sufficient notwithstanding 46-57 months guideline range); see also *United States v. Bennett*, 2008 WL 2276940 at *4 (D. Neb. May 30, 2008)(because the Sentencing Commission adjusted guideline sentencing ranges solely in response to statutory increase in minimum sentences in, inter alia, child sexual and pornography offenses, resulting ranges "are a less reliable appraisal of a fair sentence" than those grounded in empirical data).

As the courts' analyses in these cases demonstrate, neither the elevated base offense level nor the myriad enhancements that drive child pornography sentences skyward are supported by past sentencing practice or empirical data. Of concern generally, and in Julien Toulotte's case specifically, are the addition of illogical enhancements to the already inflated base offense level. As one judge has cogently noted, enhancements for use of computer, for prepubescent minor, and (as here) for a large number of images driven by the possession of videos, will likely be present in every case. See Hanson, 561 F.Supp.2d at 1010-11. Julien Toulotte's sentencing range is largely driven to an unreasonable extreme precisely because of these factors.

Judges in this district have routinely rejected this guideline for these reasons as well. One judge has stated that the guideline for this offense is "flawed," and "doesn't command the same respect that other aspects of the Guidelines may." *United States v. Stephen Hooper*, 12-cr-10156 (GAO) (Judgment, Dec. 4, 2012); *United States v. David Keith*, 11-cr-10294-GAO (Transcript of Sentencing, Sept. 29, 2014). In those cases,

12

Judge O'Toole "reconstructed" the guideline "by adjusting for the exclusion of those adjustments" that occur in over 90 percent of cases as set forth in the Sentencing Commission's 2012 report, cited *supra*. That is, the Court "omitted" the adjustments for prepubescent-minor, use of a computer, and number of images, thereby reducing the defendant's offense level by nine. The same flaws in the guidelines present themselves here and call for the application of a "reconstructed" guideline. *See also United States v. Bhavsar*, 10- CR-40018-FDS, ECF No. 56, Excerpt Transcript of Sentencing at 6; and *United States v. Kearney*, 08-CR-40022-FDS, ECF No. 151, Transcript of Sentencing at 130 (discounting the four-level increase that results from application of the prepubescent minor and use of computer enhancements).

In fact. Judge F. Dennis Saylor, IV, addressed the issue directly during the sentencing of the case of *United States v. T. Patrick Kearney* (08-CR-40022-FDS) on October 22, 2010 in United States District Court in Boston, Massachusetts when he stated that the federal sentencing guidelines for child pornography:

> "appear to be based in part on congressional mandates, not on social science or empirical evidence. They're based on the revulsion, I think, that ordinary people feel toward these crimes; and more pertinent, they're structured in an odd way so that the guideline enhancements of specific offense characteristics apply in my experience in 100 percent or close 100 percent of the cases and which gets the punishment off the charts. You know, they're based on purported individualized factors, but the factors aren't individualized. They're inherent in the crime, and the two things that are the most troublesome are the enhancement for images of prepubescent minors, which again is -- if it isn't 100 percent of the cases, it's close, and the enhancement for use of a computer. In this day and age when everyone has a computer, these images are always obtained and viewed and possessed on computers. It's hard to even buy photographic film any more."

13

As stated, these should not be enhancements because they are inherent in almost every child pornography case and therefore are mislabeled as "Specific Offense Characteristics."

The analysis of the courts in *Dorvee, Grober, Hanson*, and *Rausch* is not only persuasive, but irrefutable. This Court should likewise find that U.S.S.G. §2G2.2 is not the product of the Sentencing Commission's institutional role, does not result in a reasonable sentence, and as to Julien Toulotte, is of little value in determining a sentence that is sufficient, but not greater than necessary, to achieve the statutory sentencing goals embodied in 18 U.S.C. § 3553(a).

V.     A JUST SENTENCE

The Defendant respectfully submits this section of the memorandum in order to provide information to assist the Court in fashioning a sentence "sufficient but not greater than necessary" to achieve the statutory purposes of punishment, as required by 18 U.S.C. § 3553(a) in light of United States v. Booker, 125 S. Ct. 738 (2005). The sentence must 1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; 2) afford adequate deterrence to criminal conduct; 3) protect the public from further crimes of the defendant; and 4) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. §3553(a)(2). A sentence of 104 months, followed by five years supervised release with strict and specifically tailored conditions of release achieves those goals.

A 104-month prison term is a lengthy sentence that adequately reflects the seriousness of the offense before the Court and provides just punishment. This is the very

first incarceration in Mr. Toulotte's life. While the crime before the court is quite serious, and hence deserving of a prison term as reflected by Congress's imposition of mandatory minimum sentences and their directives as to the sentencing guidelines, Mr. Toulotte's conduct in this case is not dissimilar to other offenders who have received sentences significantly below the guideline sentencing range. In addition, Mr. Toulotte will be on supervised release for at least five years, which, in addition to its purposes of rehabilitation and protection of the public, does constitute additional punishment. He will also be obligated to pay an amount of restitution quite significant.

Furthermore, the Court should recognize the collateral consequences of a conviction such as this as part of Mr. Toulotte's punishment. One Court has noted in the past: "The collateral consequences of child pornography convictions are extreme, perhaps more extreme in some ways than any other form of criminal activity... It is a crime of extreme shame and humiliation." *United States v. Bhavsar*, 10-CR-40018-FDS, ECF No. 56, Excerpt Transcript of Sentencing at 8. For Mr. Toulotte, this conviction will follow him the rest of his life, no matter whether he reoffends or not, no matter if he successfully completes treatment or not. It will be that much harder for him to find a job, to complete his education that he was engaged in prior to his arrest, to find his own apartment, and even to find someone willing to be in a relationship with him. He likely will be subject to harassment, and maybe violence, both in prison and afterwards in the community. He will be shamed for the rest of his life. For a rather young man, this conviction carries a lifetime of punishment. As several courts have recognized, collateral consequences of conviction, such as registration as a sex offender, are relevant to the "need" for the sentence imposed to reflect just punishment. *See, e.g., United States v. Garate*, 543 F.3d

1026, 1028 (8th Cir. 2008) (overruling prior holding that it was inappropriate for the district court to consider the lasting effects of being required to register as a sex offender); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (affirming the district court's finding that the defendant "warranted a lower sentence because he lost his teaching certificate and his state pension as a result of his conduct," because "[c]onsideration of these facts is consistent with § 3553(a)'s directive that the sentence reflect the need for just punishment," and "adequate deterrence"); *United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) (affirming below-guideline sentence based in part on court's findings that defendant suffered substantial mental and personal stress as a result of his prosecution).

With regard to deterrence, the agreed-upon sentence sends a strong message to the others in the community that, even if your offense didn't involve any actual contact with minors, any violence or sexual contact, you will go to federal prison for years.

Lastly, to the extent Mr. Toulotte needs to be incarcerated to protect the public, he will be for eight years. Even when Mr. Toulotte is released from prison, he will be subject to the sex offender registry laws and as well as stringent monitoring by probation, all of which will continue to serve to protect the public.

Finally, the proposed sentence will afford effective treatment as required by section 3553(a)(2)(D). Mr. Toulotte will be able to participate in treatment programs in the Bureau of Prisons, including mental health treatment particularly sex offender specific treatment. When he is released from prison, he will be able to continue this treatment in the community, under the continued guidance of probation.

**VI    CONCLUSION**

It is undeniable, as Julien Toulotte himself acknowledges, that he has committed an offense that is illegal, inexcusable and cannot be condoned. However, Julien Toulotte stands before the court, at this time, to receive a sentence that, in some measure, places him in context and balances his wrongful act against the combination of a lawful lifetime of family, education, work, responsibility and now active engagement in rehabilitation.

For these reasons, Mr. Toulotte asks this Court to accept the binding plea agreement of the parties and impose a sentence of 104 months imprisonment followed by five years supervised release.

> Respectfully submitted,
> Julien Toulotte
> By his attorney
> /s/Peter Elikann
> Peter Elikann
> Attorney at Law
> 50 Terminal Street
> Bldg. 2, Suite 722
> Charlestown, Ma. 02129
> 617/742-9462

**CERTIFICATE OF SERVICE**

I hereby certify that I served a copy of Defendant's Motion through the ECF system, which was sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on the 3rd day of March, 2023.

> /s/ Peter Elikann
> Peter Elikann